# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| CATHERINE A. SHORT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 09-CV-1087 |
| SAMUEL FITZPATRICK, and the CITY | ) | |
| OF FAIRBURY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

# O R D E R   &   O P I N I O N

This action under 42 U.S.C. § 1983 arises from an improperly executed search warrant. Pending before the Court are Plaintiff's Motion for Summary Judgment (Doc. 74); Plaintiff's Motion to Strike Samuel Fitzpatrick's Affidavit (Doc. 82); and Samuel Fitzpatrick's Corrected Motion for Summary Judgment (Doc. 102).[1]

---

[1] The Docket indicates that Samuel Fitzpatrick currently has two identical motions for summary judgment pending before the Court. *See* Samuel Fitzpatrick's Corrected Motion for Summary Judgment (Doc. 88); Samuel Fitzpatrick's Corrected Motion for Summary Judgment (Doc. 102). Consequently, the Court hereby DENIES as MOOT Samuel Fitzpatrick's Corrected Motion for Summary Judgment (Doc. 88).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

<u>Plaintiff's Residence</u>

On March 26, 2008, Catherine Short and her 67 pound pit bull resided at 140 East Mazon Avenue, Apartment 1, Dwight, Illinois, 60420. (Doc. 102 at 2). This apartment complex in which Plaintiff resided (the "Apartment Complex" or the "Building") is a two-story apartment building which contains a total of 12 units. (Doc. 102 at 3). There are three entry doors located on the front of the Apartment Complex which faces Mazon Avenue. (Doc. 102 at 3). Plaintiff's apartment was located on the first floor of the Building. (Doc. 102 at 3). There are five units on the first floor of the Apartment Complex. (Doc. 102 at 3). There is only one public access door located on the back of the Building, which leads to the main hallway. (Doc. 102 at 3). Upon entering the main hallway from the back of the Building, the order of apartments, from the rear of the Building to the front, is apartment 1, apartment 11 and, finally, apartment 12. (Doc. 102-1 at 2). Apartments 9 and 10 are not located in the main hallway. (Doc. 102-1 at 2; Doc. 102 at 3). Instead, apartments 9 and 10 share a semi-private hallway which is only accessible from the front of the Building. (Doc. 102-1 at 2; Doc. 102 at 3). Apartments 2, 3, 4, 5, 6, 7, and 8 are located on the second floor of the Apartment Complex. (Doc. 102 at 3). On March 26, 2008, there was no exterior signage at the Building identifying the location of the apartments on the first floor. (Doc. 102 at 4).

---

[2] These background facts reflect the Court's determination of the undisputed facts, unless otherwise noted. Facts that are omitted are immaterial; if an included fact is immaterial to the Court's determination, this will be noted.

## The Search Warrant

On March 26, 2008, Officer Michael Nolan of the Village of Dwight Police Department received information from a confidential informant regarding cocaine use at apartment 10 at the Apartment Complex.  (Doc. 104-1 at 3-4).  Nolan had this informant appear before a judge in Livingston County, Illinois that same day, and the judge issued a search warrant for apartment 10.  (Doc. 104-1 at 3, 6; Doc. 107-3).  The warrant commanded that the following be seized; "Cocaine or off-white powder, chunk, rock or crystalline substances . . . cannabis, cannabis smoking devices, pipes, bongs . . . ."  (Doc. 107-3).  Nolan was unfamiliar with the Apartment Complex, so he asked the informant to explain what he should expect to encounter upon arrival at the Building.  (Doc. 104-1 at 6).  The informant told Nolan that apartment 10 was located on the first floor of the Building and that a pit bull resided there.  (Doc. 107-2 at 1; Doc. 104-1 at 4; Doc. 104-2 at 42).  With warrant in hand and a basic understanding of the Apartment Complex and apartment 10, Nolan determined to execute the warrant that same evening.  (Doc. 104-1 at 7-8).  Consequently, Nolan quickly put together a search team and arranged to have this team meet at 10:00 pm at police headquarters for the Village of Dwight.  (Doc. 104-1 at 7-8).  One of the officers on this team was Samuel Fitzpatrick, who was the most junior officer.  (Doc. 104-2 at 25).  At approximately 10:00 pm, the officers, including Fitzpatrick, arrived for the briefing.  (Doc. 104-1 at 8; Doc. 104-2 at 38).  Nolan told the officers what they would be looking for, explained how the warrant would be executed, and assigned tasks to each officer.  (Doc. 104-2 at 39-40; Doc. 104-3 at 10).

<u>The Execution of the Search Warrant</u>

The officers departed for the Apartment Complex immediately after the briefing. (Doc. 104-2 at 44). Upon arrival, the search team entered the main hall of the Apartment Complex through the rear entrance of the building. (Doc. 104-2 at 44-45). The search team then walked the entire length of the main hall, seeing only apartments 1, 11, and 12. (Doc. 104-2 at 46-49; Doc. 104-1 at 11). Nolan and the other officers also heard a large dog bark from behind the door to apartment 1. (Doc. 107-1 at 2; Doc. 104-3 at 20; Doc. 104-1 at 11). In light of the foregoing, Nolan, the officer in charge of the operation, believed that the apartment labeled as apartment 1 must be apartment 10 and that the "0" had probably just fallen off. (Doc. 104-1 at 11). Consequently, Nolan instructed the team to line up outside apartment 1. (Doc. 104-1 at 11). The officers then announced their presence and subsequently entered apartment 1. (Doc. 104-2 at 49-50). Fitzpatrick, as the junior officer, was at the back of the line of officers and was the last to enter apartment 1. (Doc. 104-2 at 31; Doc. 104-2 at 49).

Inside, the team found Plaintiff, her boyfriend, and her 67 pound pit bull. (Doc. 104-2 at 54, 60; Doc. 104-3 at 14). By the time Fitzpatrick entered apartment 1, Plaintiff was lying face down on the floor. (Doc. 104-2 at 54). Fitzpatrick then went over to the Plaintiff and handcuffed her for safety reasons while the officers finished securing the apartment. (Doc. 104-2 at 55-56; Doc. 104-3 at 14). Around this time, the officers discovered a marijuana pipe in plain view and Fitzpatrick was instructed by a senior officer to take Plaintiff and her boyfriend back to the police station for questioning. (Doc. 104-1 at 12; Doc. 104-2 at 57-58). Fitzpatrick

complied, and Plaintiff and her boyfriend were taken to the police station, which was only two blocks away from the Apartment Complex. (Doc. 104-2 at 15). Shortly thereafter, one of the officers on the search team who had remained behind discovered a piece of mail on Plaintiff's coffee table addressed to apartment 1. (Doc. 104-3 at 13-14). It was at this moment that the officers realized they had entered the wrong apartment. (Doc. 104-3 at 13).

Upon realizing their mistake, the team instructed Fitzpatrick to return Plaintiff and her boyfriend to apartment 1, and Fitzpatrick complied. (Doc. 104-2 at 25). From start to finish, Plaintiff was detained for no more than 20 or 25 minutes. (Doc. 107-1 at 7).

On March 12, 2009 Plaintiff filed the instant suit asserting a cause of action against Fitzpatrick[3] under 42 U.S.C. § 1983 for violating her Fourth Amendment right to be free from unreasonable search and seizure, unlawful arrest and detention, and the use of excessive force. Plaintiff also asserted claims for assault and battery under Illinois state law. (Doc. 7).

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp.*

---

[3] Plaintiff also named a number of other defendants. However, only Fitzpatrick and the City of Fairbury remain at this time.

*v. Catrett,* 477 U.S. 317, 323–24 (1986).  If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial."  *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986)).  A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts.  *Robin v. Espo Eng. Corp.,* 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted).  Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party."  *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  *Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson,* 477 U.S. at 255).  The court does not make credibility determinations or weigh conflicting evidence.  *Id.*

## ANALYSIS

### § 1983 Claims

### A.

The Court begins with the § 1983 claims, which are grounded on Fitzpatrick's alleged violation of Plaintiff's Fourth Amendment rights.  The Fourth Amendment guarantees the "right of the people to be secure in their persons [and] houses ...

against unreasonable searches and seizures." The "central concern of the Fourth Amendment is to protect liberty and privacy from arbitrary and oppressive interference by government officials." *United States v. Ortiz,* 422 U.S. 891, 895 (1975). Under the Fourth Amendment, a "search" occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed," *United States v. Jacobsen,* 466 U.S. 109, 113 (1984), and a "seizure" occurs "when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas,* 538 U.S. 626, 629 (2003) (per curiam) (citations and internal punctuation omitted).

"The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250 (1991). "Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon,* 472 U.S. 463, 470–71 (1985) (internal citation and punctuation omitted). This is a fact-specific inquiry. *Ohio v. Robinette,* 519 U.S. 33, 39 (1996). "[I]n order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government ... is not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez,* 497 U.S. 177, 185–86 (1990). Elaborating on this point, the Court has stated: "Because many situations which confront officers in

the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Brinegar v. United States,* 338 U.S. 160, 176 (1949).

The "purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole,* 504 U.S. 158, 161 (1992). Section 1983 allows a plaintiff "to seek money damages from government officials who have violated his Fourth Amendment rights," *Wilson v. Layne,* 526 U.S. 603, 609 (1999), but it "does not purport to redress injuries resulting from reasonable mistakes." *McLenagan v. Karnes,* 27 F.3d 1002, 1008 (4th Cir.1994). *Accord, Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008).

## B.

In response to the § 1983 claim, Fitzpatrick has asserted the defense of qualified immunity, which shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity claims present two questions: (1) whether the plaintiff's allegations make out a deprivation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925-26 (7th Cir. 2011). Courts are free "to exercise their sound discretion

in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Applying the foregoing standard, the Court will begin its analysis by answering the first prong, which the Court finds to be dispositive as to each of Plaintiff's constitutional claims.

C.

The genesis of the alleged Fourth Amendment violations in this case is Fitzpatrick's entry into Plaintiff's apartment. Fitzpatrick does not dispute that his entry into Plaintiff's apartment constitutes a Fourth Amendment "search," and it is undisputed that he did not have a warrant to enter this particular apartment. Viewed in isolation, Fitzpatrick's entry into Plaintiff's room has the appearance of a Fourth Amendment violation because "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States,* 533 U.S. 27, 31 (2001). However, relying primarily on *Maryland v. Garrison,* 480 U.S. 79 (1987), Fitzpatrick contends that his entry into Plaintiff's apartment was nonetheless "reasonable" because he had a valid warrant to enter apartment 10, and that an honest mistake was made by him and/or his fellow officers based on observations and perceptions of the room number as the raid unfolded. The Court agrees and finds instructive the cases of *Garrison* and *Hill v. California,* 401 U.S. 797 (1971).

In *Hill,* the police had probable cause to arrest a man named Hill. When they arrived at Hill's apartment, they encountered a man named Miller in the apartment. Despite Miller's presentment of identification and protestation, the

police believed in good faith that Miller was Hill, and they arrested him. During a search of Hill's apartment following Miller's arrest, police found contraband that was subsequently used against Hill at a criminal trial. Hill was convicted, and his conviction was upheld by the state courts.

The Supreme Court likewise sustained Hill's conviction. In doing so, the Court rejected Hill's assertion that the arrest of Miller (which led to the search of Hill's apartment) was invalid, holding that "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Hill,* 401 U.S. at 802 (citation omitted and internal punctuation altered). Explaining this holding, the Court stated:

> The upshot was that the officers in good faith believed Miller was Hill and arrested him. They were quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.

*Id.* at 803–04. Turning then to the validity of the search of Hill's apartment, the Court also rejected Hill's assertion that the search was invalid regardless of the validity of Miller's arrest. After noting that "there was probable cause to arrest Hill and the police arrested Miller in Hill's apartment, reasonably believing him to be Hill," the Court held that "[i]n these circumstances the police were entitled to do what the law would have allowed them to do if Miller had in fact been Hill, that is, to search incident to arrest and to seize evidence of the crime the police had probable cause to believe Hill had committed." *Id.* at 804.

In *Garrison,* the police obtained and executed a valid warrant to search the person of a man named McWebb and " 'the premises known as 2036 Park Avenue third floor apartment.' " 480 U.S. at 80. When the police obtained and executed the warrant, they reasonably believed (based on their pre-search investigation) that there was only one apartment on the third floor of 2036 Park Avenue. There were, however, two apartments on the third floor: one occupied by McWebb and one occupied by Garrison. Before the police realized that there were two apartments on the third floor, they had entered Garrison's apartment and observed contraband. Garrison was charged and convicted based on this contraband, but his conviction was reversed by the Court of Appeals of Maryland based on the grounds that the search of his apartment and the seizure of the contraband was unconstitutional. In reaching this decision, the court relied on Article 26 of the Maryland Declaration of Rights and, because of the "*in pari materia*" construction, the Fourth Amendment. *Id.* at 83–84.

Applying Fourth Amendment principles, the Supreme Court reversed. After concluding that the warrant itself was valid, the Court considered the "question whether the execution of the warrant violated [Garrison's] constitutional right to be secure in his home." *Id.* at 86. The Court noted that although "the purposes justifying a police search strictly limit the permissible extent of the search," there is also "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Id.* at 87. The Court stated that its rationale in *Hill* "that an officer's reasonable misidentification of a person does not invalidate a valid arrest is equally

applicable to an officer's reasonable failure to appreciate that a valid warrant describes too broadly the premises to be searched," and that "the validity of the search of [Garrison's] apartment pursuant to a warrant authorizing the search of the entire third floor depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 87–88. The Court concluded that it was "objectively understandable and reasonable" because the "objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises." *Id.* at 88. Notably, the Court observed that the officers properly recognized that "they were required to discontinue the search of [Garrison's] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." 480 U.S. at 87.

The material facts in this case are undisputed. Fitzpatrick had a valid warrant to enter and search apartment 10, located on the first floor of the Building. For purposes of officer safety, Fitzpatrick and the other officers entered the Apartment Complex from the rear entrance, and came across apartments 1, 11, and 12, but not apartment 10. Unbeknownst to Fitzpatrick and the other officers, Apartment 10 shared a semi-private hallway with Apartment 9, which was only accessible from the front of the Building. Additionally, there was no directory at the Apartment Complex referencing the location of the first-floor apartments. Furthermore, Fitzpatrick and the other officers knew that there was a pit-bull located in apartment 10 and they could hear a dog barking from behind the door to

apartment 1 which could have been (and, in fact turned out to be) a pit bull. It was under these circumstances that the decision was made to enter apartment 1. Fitzpatrick and the other officers were in Short's apartment for a relatively brief period of time, and they left immediately upon realizing the mistake.

Given "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants," *Garrison*, 480 U.S. at 87, the Court believes that these specific undisputed facts establish as a matter of law that Fitzpatrick's "mistake was understandable and the [search] a reasonable response to the situation facing [him] at the time." *Hill*, 401 U.S. at 804. Therefore, the Court concludes that Fitzpatrick's entry into Short's apartment and any subsequent search that resulted do not constitute a Fourth Amendment violation. *Accord, Mazuz v. Maryland*, 442 F.3d 217 (7th Cir. 2006) (Holding that officer who mistakenly executed search warrant on wrong college dorm room committed an "honest mistake" and, consequently, did not violate Fourth Amendment.)

## D.

Having determined that Fitzpatrick's entry into Short's apartment did not violate the Fourth Amendment, the Court now turns to Plaintiff's claim that she was subjected to an unreasonable seizure, an unlawful arrest and detention, and the use of excessive force.

Generally, a Fourth Amendment "seizure" may take the form of an "arrest" or a "detention." *See United States v. Brignoni–Ponce,* 422 U.S. 873, 878 (1975) ("The Fourth Amendment applies to all seizures of the person, including seizures

that involve only a brief detention short of traditional arrest."). When a warrant authorizes a law enforcement officer to enter a premises to conduct a search, the warrant "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers,* 452 U.S. 692, 705 (1981). "Inherent in [the] authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention," including the use of handcuffs. *Muehler v. Mena,* 544 U.S. 93, 98-99 (2005). This detention is a "seizure" under the Fourth Amendment, but it is not necessarily an "arrest." *See Summers,* 452 U.S. at 696 (recognizing distinction between "pre-arrest 'seizure' " and "formal[ ]" arrest).

Viewing the facts in the light most favorable to Plaintiff, there are two discrete seizures in this case. The first is when Fitzpatrick entered Plaintiff's apartment and placed handcuffs on her. The second is when Fitzpatrick removed Plaintiff from her apartment and took her into the police station and detained here there. With respect to the latter seizure, the Court will assume, without deciding, that Plaintiff is correct in her contention that this constituted an "arrest." The Court will address each seizure separately to determine whether Fitzpatrick may have violated Plaintiff's Fourth Amendment rights.

With respect to the initial seizure, the Court concludes that the seizure of Plaintiff was reasonable under the undisputed facts of this case. As the Court has previously concluded, although the warrant did not authorize Fitzpatrick to enter Plaintiff's apartment to conduct a search, his mistaken entry into her apartment was reasonable under the Fourth Amendment. The Court believes, as was held in

*Hill*, that in this circumstance once Fitzpatrick entered Short's apartment he was "entitled to do what the law would have allowed [him] to do" if he had entered the correct apartment. 401 U.S. at 804. Accordingly, the Court concludes that it was not unreasonable for Fitzpatrick to detain (and handcuff) Plaintiff when he entered her apartment. This brief detention was an appropriate measure incident to the search, and it ended as soon as the decision was made to arrest Plaintiff.

Turning next to Plaintiff's arrest; it is undisputed that Plaintiff possessed a marijuana pipe which was sitting in plain view of the officers when they entered her apartment. It is undisputed that such pipe was illegal, and that the warrant in this case specifically instructed the officers to seize it. It is also undisputed that one or more of the officers had located this pipe at the time Fitzpatrick was instructed to arrest Plaintiff and take her back to the station. In light of the foregoing, the Court concludes that Fitzpatrick was reasonable in arresting Plaintiff because the officers had probable cause to arrest her. Indeed, the existence of probable cause to arrest is an absolute defense to any claim under § 1983 for false arrest. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (2006).

Having concluded that Fitzpatrick did not unreasonably seize, arrest, or detain Plaintiff, the only remaining Fourth Amendment question is whether he used excessive force in seizing, arresting, or detaining Plaintiff. For the following reasons, the Court concludes that Fitzpatrick did not use excessive force against Plaintiff.

The uncontroverted evidence shows that Plaintiff was already lying face-down on her floor when Fitzpatrick entered the room. Therefore, the only physical

contact which Fitzpatrick had with Plaintiff was when he placed handcuffs on Plaintiff, when he helped her to her feet, and when he assisted her in getting into the back of his squad car. The sole ground for Plaintiff's complaint of excessive force directed at Fitzpatrick is that he allegedly put the handcuffs around her wrists too tightly. As a result, Plaintiff claims that she had bruises on her wrists for about a week, for which she did not seek medical treatment. Notwithstanding the tightness of the handcuffs, Plaintiff admits that she never once complained to Fitzpatrick regarding the tightness of the handcuffs, nor did she ever ask him to loosen them.

The Seventh Circuit Court of Appeals has, on occasion, recognized valid excessive force claims based on overly tight handcuffs. In *Payne v. Pauley,* 337 F.3d 767 (7th Cir.2003), there was evidence that the arresting officers handcuffed the plaintiff so tightly she lost feeling in her hands and refused to loosen the cuffs when she told them of the numbness. *Id.* at 774–75, 781. The plaintiff later underwent two carpal tunnel surgeries she said were necessitated by the handcuffing, and it was held that summary judgment under these circumstances was inappropriate. *Id.* at 775, 780–81.

In *Herzog v. Village of Winnetka,* 309 F.3d 1041 (7th Cir.2002), the Seventh Circuit Court of Appeals held the plaintiff was entitled to a jury trial on her excessive force claim where she produced evidence that the arresting officer lacked probable cause for the arrest, shoved her to the ground even though she was not resisting, cracked her tooth by forcing a breath-screening device into her mouth, waited over an hour to loosen handcuffs she complained were too tight, and

subjected her to blood and urine testing at a hospital, even though she had passed all field sobriety tests and had registered a 0.00 Breathalyzer reading. *Id.* at 1043–44. *See also Lester v. City of Chicago,* 830 F.2d 706, 714 (7th Cir.1987) (a properly instructed jury could have found excessive use of force if it believed plaintiff's testimony that even though she did not resist arrest, officers threatened to punch her, kneed her in the back, dragged her down a hallway, and handcuffed her so tightly her wrists were bruised).

None of the foregoing cases are analogous to Plaintiff's allegations. The plaintiff in *Payne* told the officers her hands were numb and ultimately underwent two surgeries because of wrist injuries caused by the too-tight handcuffs. *Payne,* 337 F.3d at 774–75, 780–81. Here, Plaintiff never complained, gave the officers no indication of the degree of her pain, experienced minimal (if any) injury, and sought no medical care. Furthermore, the decisions in *Herzog* and *Lester* were hardly based on overly tight handcuffs alone. The *Herzog* and *Lester* plaintiffs presented evidence they had suffered numerous additional injuries, including a cracked tooth, plainly gratuitous blood and urine testing, being kneed in the back, and being dragged down a hallway. *Herzog,* 309 F.3d at 1043–44; *Lester,* 830 F.2d at 714.

Plaintiff cites no cases in which any court has permitted a plaintiff to reach a jury based on such mild allegations as those which Plaintiff now makes. Consequently, no reasonable jury could find that Fitzpatrick used excessive force on Plaintiff and, accordingly, her excessive force claim fails. *Accord, Tibbs v. City of Chicago*, 469 F.3d 661 (7th Cir. 2006).

E.

In light of the foregoing, the Court holds that Fitzpatrick did not violate the Fourth Amendment by entering Plaintiff's apartment, seizing, and subsequently arresting her. Therefore, Plaintiff's § 1983 claims must fail. In light of this determination, there is no necessity for further inquiries regarding qualified immunity.

F.

<u>State Law Claims</u>

The only claims remaining for consideration are Plaintiff's state law claims, all advanced under the supplemental jurisdiction auspices of 28 U.S.C. § 1367(a). Most frequently a federal court will relinquish jurisdiction over such supplemental state law claims when the federal claims are dismissed before trial. *See, e.g.*, *Rothman v. Emory Univ.,* 123 F.3d 446, 454 (7th Cir.1997). But courts are not required to do so, for "there are some cases 'in which the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness and comity-will point to federal decision of the state-law claims on the merits.' " *Id.,* quoting *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251 (7th Cir.1994).

This case presents just such an exception. No useful purpose would be served by eschewing jurisdiction over the remaining claims, given the ease of making those determinations. Additionally, in light of the poverty of Short's claims, this Court is loath to require Fitzpatrick to face the possibility of having to defend the meritless new action that could be filed in state court if a purely procedural dismissal were to be entered. This opinion therefore turns to a resolution of those claims.

*Smith v. City of Chicago,* 242 F.3d 737, 744 (7th Cir.2001) has set out the components of a battery claim under Illinois law as follows:  A battery occurs when one "intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual."  720 ILCS 5/12-3(a).  A public employee is immune from liability while enforcing the law unless their acts are willful and wanton.  *See* 745 ILCS 10/2-202.  Conduct is willful and wanton when it "shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property."  745 ILCS 10/1-210.

And *Bowker v. Donahue,* 443 N.E.2d 786, 788 (Ill. App. Ct. 1982) defines the tort of assault as "an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented."

The foundation for Plaintiffs' assault and battery claim against Fitzpatrick stems from his allegedly placing the handcuffs on her wrists too tightly.  The Court has already concluded that, under the facts of this case, Fitzpatrick's use of the handcuffs on Plaintiff did not constitute excessive force against Plaintiff.  For the same reasons discussed, *supra*, the Court concludes that no reasonable jury could find that Fitzpatrick battered and/or assaulted Plaintiff by placing her in handcuffs.  Furthermore, even if a reasonable jury could find that Fitzpatrick somehow battered and/or assaulted plaintiff, there is not a scintilla of evidence indicating

that Fitzpatrick's actions were willful or wanton. As such, Fitzpatrick is immune from liability pursuant to 745 ILCS 10/2-202. Consequently, Plaintiff's state law claims for assault and battery fail as a matter of law. *Accord, Smith,* 242 F.3d at 744 (Upholding summary judgment in favor of defendant officers on state law assault and battery claims where facts demonstrated a materially more forceful arrest than that in the instant case).

## G.

### The City of Fairbury

In her Amended Complaint, Plaintiff names Fitzpatrick's employer, the City of Fairbury, as a defendant. However, a close reading of the Amended Complaint reveals that the City of Fairbury is not named in any of the counts asserted against Fitzpatrick or the other defendants who were initially named in the Amended Complaint. Instead, Plaintiff only names the City of Fairbury as a defendant on the ground that the "City of Fairbury is a necessary party to this action . . . because the City of Fairbury has a responsibility to indemnify Samuel Fitzpatrick's [sic] for official-capacity judgments . . . ." (Doc. 7 at 3). Consequently, it is evident that the City of Fairbury cannot be found liable in this matter if Fitzpatrick is not found liable. Notwithstanding this, Counsel for Fitzpatrick (who is also the attorney of record for the City of Fairbury) neglects to mention this in his brief in support of Fitzpatrick's Corrected Motion for Summary Judgment and fails to move for summary judgment for the City of Fairbury. Thus, if the Court merely gives Fitzpatrick's Counsel exactly what he asks for (i.e. summary judgment for Fitzpatrick) then the City of Fairbury is left with the absurd result of having to go

to trial to defend against the actions of Fitzpatrick – actions which the Court has concluded, *supra*, were such that liability does not attach to them.  For the foregoing reasons, and because the Court concludes that Fitzpatrick is entitled to summary judgment, the Court hereby *sua sponte* GRANTS summary judgment in favor of the City of Fairbury.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 74) is DENIED; Plaintiff's Motion to Strike Samuel Fitzpatrick's Affidavit (Doc. 82) is DENIED as MOOT;[4] and Samuel Fitzpatrick's Corrected Motion for Summary Judgment (Doc. 102) is GRANTED.  The Clerk is DIRECTED to ENTER JUDGMENT in favor of Defendants and against Plaintiff.  IT IS SO ORDERED.


CASE TERMINATED.


Entered this 1st day of August, 2011.


s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge

---

[4] Because the Court does not cite to or rely on Fitzpatrick's Affidavit (Doc. 78) in this Order & Opinion, the Court need not determine whether it should be stricken.